HERMENFGILDO HANCE, demandante y apelante, *v.* R. MÉNDEZ & HNOS., demandada y apelada.

Núm. 7129.—*Sometido:* Junio 15, 1937. *Resuelto:* Noviembre 24, 1937.

*Luis Apellániz Storer,* abogado del apelante; *R. Díaz Collazo,* abogado de la apelada.

El Juez Presidente Señor Del Toro emitió la opinión del tribunal.

Éste es un pleito sobre daños y perjuicios fallado en contra del demandante.

En la demanda se alega que el 14 de mayo de 1934 la mercantil demandada era dueña de un camión dedicado al transporte de carga que guiaba su socio Alejandro Méndez por la carretera insular núm. 3, yendo en la plataforma Leonides Hance, su empleado, y que al doblar una curva Méndez no redujo la velocidad y como fuera por el centro de la carretera, al enfrentarse con otro camión que iba en dirección contraria desvió súbitamente, lanzando al camino a Hance que se fracturó el cráneo y murió a consecuencia de la fractura.

Se alega, además, que Hance iba sujeto con sus manos a una de las divisiones de madera del camión y que éste a pesar de llevar carga no tenía barandas laterales, que Hance tenía diez y nueve años de edad, era activo y saludable, cursaba el octavo grado en las escuelas públicas y ganaba un peso diario con el cual ayudaba a sus padres que son sus únicos herederos, estando la madre recluída en el manicomio insular.

La demanda la interpuso el padre. Reclama como compensación por sus sufrimientos morales y pérdidas materiales diez mil dólares.

Aceptó la demandada que era dueña del camión, que lo guiaba su socio Alejandro Méndez, que Hance era su empleado, que cayó y murió; pero sostuvo que la caída se debió a la propia negligencia del empleado consistente en haberse sentado sobre un barril de aceite que rodó debido al movimiento natural del vehículo al tomar la curva, perdiendo Hance el equilibrio y cayendo en el momento mismo en que pasaba otro camión que lo arrolló y le produjo las contusiones que le ocasionaron la muerte.

Alegó, además, la demandada que los padres de Hance acogiéndose a la Ley núm. 85 de 1928 (pág. 631), presenta-

ron su reclamación a la Comisión Industrial que la resolvió definitivamente, motivo por el cual quedaron impedidos de recurir a los tribunales de justicia.

Fué el pleito a juicio y la corte lo falló en contra del demandante, como ya dijimos. En su relación del caso y opinión se expresó, en parte, como sigue:

"El sitio del accidente fué inspeccionado por el tribunal . . . es una curva que por la topografía natural del terreno, impide la visión de un lado a otro, o sea, de las dos rectas que están unidas por la curva. La carretera tiene un ancho de 6 metros 80 centímetros en el sitio en donde según la prueba, se cruzaron los vehículos. Éstos, medidos por el márshal en presencia del tribunal, tienen el de la demandada 2 metros de ancho, y el otro un metro 92 centímetros. Al llegar el *truck* de la demandada, decimos nosotros estableciendo los hechos, de acuerdo con la evidencia al vértice o ángulo de la curva y como a una distancia, que cerca del sitio donde queda el vértice o ángulo más agudo de la curva, y en los momentos que otro *truck*, que venía en dirección contraria le pasaba al de la demandada, se cayó un *drum* (barril de acero) e inmediatamente después cayó en la carretera el cuerpo de Leonides Hance Mateo. El *truck* de la demandada venía cargado con 93 cajas de fideos y 3 *drums* (barriles de acero) vacíos. Ni las cajas ni los otros *drums* (barriles de acero) se cayeron. No hubo choque entre los vehículos y nada sostiene la alegación de la demandada de que otro *truck* arrollara o causara lesiones al occiso. El único testigo presencial de los hechos, esto es, el único testigo que presenció la caída, Pelegrín Torres, no puede dar una descripción exacta de cómo fué la caída. La demandada presentó un documento también jurado y suscrito ante un notario público por este mismo testigo, que da una versión completamente contraria a la dada en el juicio. El hecho cierto es, después de considerar toda la prueba, que el fenecido Leonides Hance, que venía ese día trabajando como peón de la demandada, venía en la plataforma, no sabemos si sentado, o parado, y que al tomar el autocamión de la demandada la curva que existe en el sitio a que nos referimos en la inspección ocular, otro camión que venía en dirección contraria le pasó, y sin que hubiera choque o conmoción alguna, inmediatamente después se cayó un *drum* (barril de acero) de los tres que venían como parte de la carga y detrás del *drum* cayó Leonides Hance Mateo a la carretera, sufriendo lesiones de las cuales falleció.

"Veamos si los actos de negligencia alegados por el demandante han quedado establecidos por la prueba. Descartando el testimonio de Pelegrín Torres, Francisco Rivera describe la velocidad del auto-camión de la demandada como 'bastante regular;' Ana María Pérez la describe 'mucha velocidad;' Ramón Rivera Vizcarrondo declara que antes del accidente el empleado de la demandada le pasó en su auto-camión a una velocidad superior a la que él llevaba, que era de 30 a 35 kilómetros por hora; Secundina Conde, que 'iba a grande velo-cidad;' igual manifestación hizo Eladio Mulero. Todos convienen en que el autocamión de la demandada venía por el centro de la carretera. No aparece de la prueba que se cayera ninguna otra parte de la mercancía que el *truck* conducía; que el vehículo chocara con otro, ni que tampoco se cayera otro de los peones que venían mon-tados en la plataforma.

"Ninguna ley en Puerto Rico impone la obligación de que un auto-camión de carga esté provisto de barandas laterales sobre su plata-forma a fin de evitar la caída de las personas que viajan en el mismo. No constituye tampoco negligencia *per se* el que un vehículo camine por el centro de la carretera, si tiene el camino expedito, y nada hay que le haga presumir la existencia de algún peligro inmediato. En el caso de *Aguayo* v. *Municipio de San Juan*, 35 D.P.R. 425, la prueba tendió a demostrar que el conductor del vehículo propiedad del municipio, ocupaba el centro de la carretera, y se resolvió que generalmente no constituye negligencia accionable el que el conduc-tor de un vehículo ocupe cualquier parte del camino cuando no está pasando por su frente ningún vehículo o persona. La regla general en acciones de negligencia, es que la ocurrecia de un accidente no crea ninguna presunción de negligencia, a menos que las circunstan-cias que rodean el suceso causante del daño sean de tal carácter que ofrezcan una base para inferir razonablemente que si se hubiera ob-servado el debido cuidado, diligencia y celo por parte del obligado a ello, el accidente no hubiera ocurrido. Doctrina ésta que aparece citada en *Correa* v. *The Fajardo Sugar Co.*, 29 D.P.R. 341, 345. También es conocida la regla de que la negligencia debe probarse por lo menos razonablemente.

"Discute el demandante en su alegato que la inferencia a que lógicamente puede conducirnos el análisis de la prueba, es a la de que el accidente ocurrió por la culpa o negligencia del agente de la de-mandada, y que la doctrina de *res ipsa loquitur* es aplicable. Aquí la demandada ha ofrecido una explicación satisfactoria del hecho y su único pecado ha sido pretender que este accidente fuese some-tido a decisión de la Comisión Industrial de Puerto Rico, para que

este organismo pagase indemnización al demandante por virtud de tal accidente. Esta inferencia la hace resaltar el demandante en cuanto a las contradicciones que se notan en las declaraciones de los testigos. Ya antes hemos dicho que hay uno de ellos, Pelegrín Torres, cuyo testimonio tenemos que descartar, no obstante ser un testigo presencial de los hechos. Las manifestaciones que hizo en su declaración ante el tribunal y aquéllas que hiciera ante un notario, desvirtúan por completo su declaración, ya que en una y en otra relata la ocurrencia de hechos completamente absurdos. Pero tomando las declaraciones de los demás testigos y apreciando nosotros el calibre mental de éstos, llegamos a la conclusión de que no hay aquellos elementos de prueba que podrían dejar satisfacer la conciencia de un juzgador al dictar un fallo condenatorio en este caso, ya que la prueba es tan deficiente, imprecisa y vaga, que no habría base suficiente para sostenerlo. En *Pacheco* v. *Méndez*, 41 D.P.R. 697, se cita la doctrina jurídica de *Cruz et al.* v. *Frau*, 31 D.P.R. 92, 98, en cuanto a la obligación que tiene el conductor de un vehículo al tomar una curva, de reducir la velocidad, ya que ignora lo que ha de encontrar después de la curva, y toda vez que si tiene absoluto control sobre la máquina, de ir a una velocidad moderada, puede evitar el accidente; pero en este caso son los propios testigos del demandante, quienes no determinan, en primer lugar, la exagerada velocidad del conductor, y en segundo lugar, porque por nuestra apreciación del sitio en donde se desarrollaron los hechos, no creemos posible que un vehículo pesado de motor pueda tomar la curva que allí existe a una velocidad tal que determine la caída de un *drum* (barril de acero), que es un artefacto de pesada construcción, pues según un testigo dijo, pesaba 150 libras. Sin embargo, ninguna de las cajas de madera usadas para envasar fideos, que estaban vacías y que constituían la mayor parte de la carga del *truck,* se salió del mismo ni niguna otra persona sufrió golpe, lesión o accidente alguno con motivo de haber tomado la curva el agente de la demandada, en la forma que se alega en la demanda. La circunstancia de que el *truck* de la demandada aparezca a mayor distancia de la que el demandante expuso en su declaración, tampoco tiene significación si se considera que en la dirección Oeste, o sea hacia San Juan, la carretera forma una pendiente bastante inclinada, y si se considera además que de acuerdo con nuestras mensuras la distancia de donde cayó el muchacho al sitio donde paró el *truck* hay como tres de 40 (sic) metros. No se puede, esperar que un vehículo pesado de motor pare automáticamente y sin que deje una profunda huella o surco en la carretera o se percaten de tal parada súbita los ocupantes del vehículo.

Nada de esto arrojó la prueba. La circunstancia de que en este caso un hombre joven, robusto, de alguna instrucción haya perdido la vida, no puede constituir *per se* fundamento bastante para imputar negligencia a la demandada. Creemos que una persona que aborda un vehículo como el de la demandada, o sea un autocamión destinado al transporte de mercaderías, asume cierto riesgo en cualquier lesión que pudiera sobrevenir. Si no en absoluta concordancia con esta teoría, le sirve, sin embargo, de fundamento la doctrina jurídica del caso de *Rivera* v. *Graham,* 34 D.P.R. 1.

"Apreciando toda la evidencia aportada en este caso y después de estudiar las declaraciones de los testigos de una y otra parte, y de considerar las apreciaciones que hace el Tribunal Supremo de Puerto Rico en el caso de *Pacheco* v. *Méndez,* supra, por labios de su malogrado juez y maestro, Hon. Jacinto Texidor, de las declaraciones de los testigos sobre su fuerza probatoria, sobre su veracidad y sobre la verosimilitud de los hechos que describe, llegamos a la conclusión de que no ha probado el demandante los actos de negligencia que imputa a la demandada, y en estas condiciones, no puede prosperar su demanda."

El demandante en su alegato sostiene que la corte erró al establecer los hechos, al exonerar de culpa y negligencia a la demandada, al apreciar la prueba y al declarar no aplicable la doctrina de *res ipsa loquitur,* y le atribuye prejuicio y apasionamiento en su actuación.

Examinemos la evidencia. Para probar el matrimonio del demandante con Laura Mateo, el nacimiento de Leonides Hance y su defunción presentó el demandante tres certificaciones que se admitieron sin objeción de la parte demandada. Con su objeción se admitió otra certificación creditiva de que Leonides cursó la escuela elemental.

Comenzó entonces la prueba de testigos. Declaró el propio demandante. Dijo que le avisaron del accidente y salió en busca de su hijo encontrándolo al fin muy grave en la Clínica Miramar; que fué a ver a Alejandro Méndez "y me dijo que el muchacho venía en el *truck* y se estropeó allá en Piedras Blancas. 'Yo he tratado por llevarlo a la Comisión para hacerte así el favor de que tú no quedes mal, aunque él no venía trabajando, yo lo traía encargado para que se

342

entendiera con unos sacos que iba a dejar allá en Santurce;'"
que regresó a su casa de Loíza y al día siguiente le infor-
maron que su hijo había muerto, vino y vió su cadáver; que
su esposa está en el manicomio; que tiene con ella cinco
hijos con quienes vive en su casa; que Leonides tenía diez
y nueve años, era de naturaleza fuerte y le ayudaba en su
trabajo ganando de noventa centavos a un peso diarios que
empleaba en sí mismo y en los gastos de la casa y calcula
la pérdida material que su muerte le ha ocasionado en seis
o siete mil pesos, habiendo reclamado por la total diez mil.

Seguidamente fué llamado Pelegrín Torres, quien declaró
que era peón del camión de Méndez & Hno. que guiaba Ale-
jandro el día del accidente, 14 de mayo de 1934; que en el
camión iban también Leonides Hance, Alejandro Ortiz y otro
que le dicen Luis, que el camión iba ligero por el centro de
la carretera, y al aproximarse a la curva no tocó; que en la
curva "se encontró con otro *truck* que subía y por la misma
rapidez que llevaba dió un zigzag y se cayó un *drum* y de-
trás del *drum* se cayó Leonides Hance sobre la carretera;"
que iban cuatro *drums* sueltos en la plataforma; que Hance
iba frente a él, parte izquierda, en el medio de dos *drums*
parados.

A repreguntas de la defensa contestó:

"P.—¿De manera que usted le quiere decir a la corte que venían
cerca de cien cajas de fideos vacías? R.—Cincuenta y tres. P.—
¿Con un encerado por encima, sin atar? R.—Las cajas no venían
amarradas, el encerado venía amarrado por encima, como se le pone.
P.—¿De manera que las cajas no se movieron? R.—Cuando hizo el
zigzag se cayeron las cajas por el lado. . . . P.—¿En la parte tra-
sera de la plataforma del camión venían cuatro *drums*? R.—Cuatro
*drums*. . . . P.—¿Esos *drums* no venían amarrados? R.—No, se-
ñor, en ningún momento. . . . P.—¿Y Leonides no estaba sentado
sobre un *drum*? R.—No señor, estaba parado. Aquí está un *drum*
y aquí está él, recostado sobre la baranda. . . . P.—¿Y a juicio de
usted, Méndez tomó la curva muy ligero? R.—Si no la toma tan
ligero, no pasa el accidente. . . . P.—¿La caída de Hance, si usted
lo sabe, coincidió en el momento en que se cruzaban los dos vehícu-

los, o fué más o menos antes de que se cruzaran o después de cruzarse? R.—La caída del muchacho coincidió con el zigzag que dió Alejandro Méndez cuando vió el otro *truck*. P.—¿Pero coincidió la caída del muchacho más o menos antes, en los momentos o después de haberse cruzado el *truck*? R.—En el mismo acto que hizo así, para adentro, cayó el muchacho en la parte atrás del otro *truck*. P.—¿Y el otro carro no lo estropeó? R.—No señor. . . .''

Se llamó entonces a Francisco Rivera quien dijo que estaba parado en la carretera, en la curva de Piedras Blancas, y vió al camión de R. Méndez & Hno., guiado por Alejandro Méndez ''y alante venía un señor con él y atrás venían tres personas, y cuando llegaron allí a la curva, al mismo centro de la curva, apareció el otro carro, . . . él entonces trató de sacar el cuerpo porque venía a velocidad y un poco de su derecha, y entonces cuando hizo así, que trató de echar el guía para coger su derecha, entonces . . . salió un *drum* y detrás del *drum* un muchacho que se cayó al suelo y se reventó en el suelo con la calle.''

Francisco Carrillo, el siguiente testigo, dijo que vivía cerca de la curva de Piedras Blancas, que acababa de soltar dos yuntas de bueyes y al salir al camino vió ''el *truck* de don Alejandro'' que venía de Carolina para Río Piedras y al enfrentarse con otro de Jesús Arroyo que subía en dirección contraria tuvo que desviarse porque se trataba de una curva bien cerrada e iba a mucha velocidad y ''se fué un *drum* alante y la víctima atrás.''

Ana María Pérez dijo que vivía a la orilla de la carretera y sintió un alboroto de ''un *truck* que venía muy ligero, y al venir ese *truck* muy ligero, venían unos señores encima del *truck* y dice uno 'Gallego, Gallego, Gallego, para, para, que mataste a uno.' Entonces él siguió corriendo y mucho más para abajo de mi casa se paró. . . El *truck* venía a mucha velocidad, iba corriendo demasiado de mucho . . . apeé abajo al patio de mi casa, que hay una puerta de entrada a la carretera y en eso miré así para arriba, y cuando vi así para arriba vi al señor tendido en la carretera. . . . . Entonces

corrí para arriba de mi casa, cogí un cubo de agua para írselo a echar, creyendo que estaba vivo, pero cuando llegó el cubo de agua, me dijeron, 'No le eche agua que ya está muerto.' Pero ahí, a los pocos minutos boqueó así y se inclinó y allí entonces le echamos el cubo de agua.''

Ramón Rivera Vizcarrondo, Márshal de la Corte Municipal de Carolina, manifestó que iba en su auto en dirección de Carolina a Río Piedras, a una velocidad de 30 a 35 kilómetros y Méndez con su camión le pasó cerca de la curva de Piedras Blancas y al llegar a dicha curva encontró un jovencito tendido en la carretera y gente corriendo hacia él, paró y vió al camión como a 50 ó 60 metros.

Jesús Arroyo que era la persona que guiaba el otro camión declaró que en efecto iba de regreso para Carolina con su *truck* cargado con unos ochenta quintales, despacio, subiendo una cuesta y se enfrentó con Alejandro Méndez que iba bastante ligero cogiendo una curva ''y al enfrentarse conmigo, haló el guía para su derecha'' y ''se cayó un *drum* y un hombre al suelo;'' que él iba por su derecha y Méndez por el centro de la carretera, . . . que lleva manejando ocho años, ''cuando yo llevo *drums*, cuando van cargados, como pesan cinco quintales, se pueden llevar así, sueltos, pero cuando van vacíos, se llevan amarrados;'' que el camión de Méndez ''tenía barandas alante y en el medio y atrás,'' no laterales, ''los *drums* iban parados y llevaban una soga así.''

Secundino Conde, quien viajaba en la parte delantera del camión de Arroyo, dijo que iban a poca velocidad por su derecha porque llevaban mucha carga y subían una pendiente cuando se enfrentaron en la curva con el *truck* de Méndez que viajaba a gran velocidad; Méndez ''al darse cuenta que veníamos nosotros, desvió a su derecha y al desviar a su derecha se salió un *drum* vacío de gasolina, y al mismo tiempo que se caía el *drum*, se cayó un muchacho en el mismo medio de la carretera; en ese momento desvíamos el *truck* para una parte llana que es de grama así, una entrada que hay en Los Mameyes, y allí nos paramos.''

Eladio Mulero, quien guiaba otro *truck* que iba detrás del de Arroyo, manifestó que al encontrarse Méndez con Arroyo, el primero "hizo un zigzag para defenderse del *truck* que se encontraba en la curva," y Arroyo "se tiró para la cuneta de allá y le quedó la rueda montada en el talud, y el señor Méndez desvió, y entonces se cayó el *drum* y el muchacho en esta posición. . . ."

A la pregunta "¿El *truck* guiado por Alejandro Méndez usted pudo notar si caminaba por su derecha al coger la curva?," contestó: "No, por eso fué el movimiento que tuvo que hacer el zigzag, porque cogió la curva por el centro de la carretera."

Raimundo Pagán, jefe de distrito de la policía insular, fué a investigar el accidente al sitio donde ocurrió y Méndez le dijo, refiriéndose a Hance, que "aunque él no era peón del carro, pero puede usted ponerlo, porque él trabajaba antes conmigo, podríamos ponerlo," a lo que se negó el testigo.

José Dolores Ríos, también jefe de distrito de la policía insular, declaró que Méndez le "dijo de que el muchacho éste (refiriéndose a Hance) viajaba en el *truck,* que iba atendiendo unos sacos, que él lo conducía a San Juan para que atendiera a unos sacos mientras los peones iban a coger carga, y que siendo hijo de un señor a quien él apreciaba y distinguía, y que siendo empleado del *truck,* que reportaría el caso como peón a la Comisión Industrial. . . ."

Antonio Falú acompañó al demandante cuando vino a San Juan a ver a su hijo en la Clínica y fué luego con él donde Méndez. "Fuí y hablé con Méndez y él dijo que el paciente ya estaba en la Clínica Miramar, y que Hermenegildo no tenía que apurarse, puesto que el caso que le ocurrió a él, aunque no estaba trabajando, que le había llevado para que le vendiese unos sacos en Santurce, que él buscaba la manera de que se arreglara el asunto. Entonces él vino al carro y eso mismo le explicó a Hermenegildo Hance delante de Rafael Budet y Pelegrín Torres. . . ."

Llamado nuevamente Jesús Arroyo declaró como sigue:

"Sr. Apellániz: ¿En qué sitio de la curva paró usted su *truck?*

"R.—Yo paré en la entrada de Los Mameyes, qué es una entrada que hay cogiendo la misma curva ésa, que sale un camino así, y desechando la carretera de brea, me metí así, tapando la entrada de Los Mameyes.

"P.—¿A qué tiempo de ocurrir el accidente usted paró?

"R.—Seguido.

"P.—¿Por qué pudo parar seguido?

"R.—Porque iba poco a poco, subiendo una curva, iba bastante cargado.

"Sr. Apellániz: Nada más.

"La Corte: La otra parte.

"Sr. Díaz Collazo: Nada.

"Sr. Apellániz: Entonces, hemos terminado nuestro caso."

La parte demandada presentó una moción de *nonsuit* que fué declarada sin lugar. Introdujo su prueba. Ramón Arias, empleado de la Maryland Casualty Company, fué su primer testigo. Se le mostró un documento y dijo que era la declaración jurada que había tomado al testigo del demandante Pelegrín Torres ante el notario público Ríos Algarín. Que no hizo al testigo amenaza ni ofrecimiento algunos.

Se llamó al notario Ríos Algarín quien reconoció el documento como la declaración de Torres jurada ante él voluntariamente por el testigo, después de leerla por sí mismo.

Se presentó el documento en evidencia y la corte lo admitió "no como prueba del caso, sino para impugnar el testimonio de Pelegrín Torres en cuanto a que, en fechas anteriores, hizo manifestaciones contrarias a las que hizo en la silla de testigos."

Dice la declaración "que el día 14 de mayo de 1934 salimos de Canóvanas para San Juan en el *truck* Day Elder Lic. H. P. 65, manejado por Alejandro Méndez, los peones Leonides Hance, Luis García y yo. Que los tres veníamos montados en la plataforma del *truck,* pero Hance venía sentado sobre un *drum* de tres que habíamos colocado nosotros mismos en la plataforma al salir de Canóvanas. Que en el

trayecto y viniendo nuestro *truck* a una velocidad moderada. y al tomar una curva se viró el *drum* en que venía sentado Hance y éste cayó a la carretera en los precisos momentos en que venía otro *truck* en dirección contraria, el cual le pasó por encima causándole graves lesiones. Que de ahí lo recogimos y lo llevamos al Hospital Municipal de Carolina y de allí lo pasaron a la Clínica Miramar en donde tengo entendido falleció. Que me consta que el señor Hance era peón auxiliar del *truck* y que ese día venía a cargar con nostros. en San Juan. Que el que manejaba el *truck* en que yo viajaba, Sr. Alejandro Méndez, no tuvo culpa alguna en el accidente, pues en todo momento lo manejó con mucho cuidado y a velocidad moderada.''

Luis García Vizcarrondo, peón del camión del demandado, fué el siguiente testigo. Dijo que Hance iba en la parte trasera de pie, sentándose unas veces en un *drum* vacío; que ''al entrar en la curva venía ese otro *truck*, y Alejandro tomó la curva por su derecha, cuando haló el guía se salió el *drum* con el muchacho.'' Preguntado: ''¿Estaba sentado él entonces sobre el *drum*?,'' contestó: ''Eso no estoy seguro si estaba o si fué que lo agarró, porque como yo estaba de espaldas, yo lo vi que se fué con el *drum*.'' Que nada más se cayó del camión, que los *drums* ''traían una soga pasada.''

Alejandro Ortiz, comerciante, iba con Méndez sentado en la parte delantera del camión, los *drums* iban detrás de las cajas de fideos, las cajas ''iban amarradas, no podían venir sueltas de ninguna manera,'' los *drums* ''yo no me fijé si venían amarrados, pero un *drum* no puede andar por la carretera sin amarrar;'' caminaba a velocidad moderada, se cruzaron sin chocar, cuando ''íbamos un poquito más adelante de la curva . . . tocaron timbre y yo le dije, 'Tocayo, párese que ese timbre es a usted.' '' . . . ''y le dije, 'Párese que se ha caído un muchacho,' y fuí el primero que abrí la puerta.''

Juan Rivera declaró que el ancho de la carretera en el sitio donde ocurrió el accidente es el de seis metros ocho centímetros, el del camión del demandado dos y el del de Arroyo uno y cinco octavos.

Testificó por último el propio Alejandro Méndez, socio de la demandada y chófer que guiaba el camión en que iba Hance. En resumen dijo que cargó en el camión noventa y nueve cajas de fideos vacías y tres *drums* vacíos que se colocaron en la segunda plataforma amarrados "con un cáñamo que abrazaba las cajas y el encerado y los *drums;*" que Torres, Hance y García iban detrás; que es chófer desde 1930 y está familiarizado con la carretera; que al llegar a la curva tocó *klaxon* y al enfrentarse con el otro *truck* que subía oyó un golpe y se paró; que no hubo colisión; que atendió a Hance llevándolo al hospital; que el Jefe de la Policía le dijo "usted puede marcharse;" que llevaba tres peones, uno de ellos Hance, a quien puso a trabajar por otro que estaba enfermo.

En el acta de inspección ocular se consignó lo que sigue:

"Desde la entrada de un camino que se le informa al Tribunal se llama Martín González, aprecia el Tribunal que en dirección Este es una recta, y la carretera sigue en línea recta. En el punto en que está situado el juez, forma una curva que por la topografía del terreno impide la visión desde la recta al otro extremo de la carretera. La carretera tiene en este sitio una anchura de 6 metros 80 centímetros; hacia la parte izquierda hay un pequeño talud y a la derecha un pequeño desnivel que forma la cuneta, pero de muy poco fondo. Aprecia también el Tribunal que desde el punto de donde ha hecho la observación y hacia el Oeste hay una pequeña pendiente. Del sitio donde hizo el juez la observación a donde el demandado manifiesta paró su *truck*, hay una distancia de 49 metros 40 centímetros; y del sitio de donde practicó la observación el juez a donde las partes convienen que cayó el muchacho, hay una distancia de 11 metros 60 centímetros. Del sitio donde dice el demandado que paró su *truck* al sitio donde dicen los testigos de la otra parte que paró su *truck*, hay una distancia de 41 metros, 20 centímetros, y queda frente a la casa de la testigo Ana María Pérez, y la Corte puede apreciar que del rastrillo de entrada de la casa de esta testigo es per-

fectamente visible el sitio en que los testigos todos convienen en que cayó el occiso. El *truck* del demandado mide 5.90 metros de largo por 2 metros de ancho. Aprecia la Corte que el vuelo o curva de la carretera frente al camino Martín González y que une los dos trozos rectos de carretera, tiene un desarrollo de 30 metros. Las partes aceptan que el *truck* del demandado, que está en el sitio de la inspección, marca Day Elder, mide 5.90 metros de largo por 2 metros de ancho, y la Corte aprecia también que la plataforma del *truck*, a lo largo, está dividida por dos rastrillos o barandillas, pero que no tiene barandas laterales. La altura de la plataforma de este *truck* es de un metro 5 centímetros. La distancia entre el sitio en que paró el otro camión que conducía Jesús Arroyo al otro extremo es de 6 metros 90 centímetros. El *truck* de Jesús Arroyo, que está también en el sitio de la inspección, tiene una anchura en su plataforma de 1 metro 94 centímetros; su largo es de 5 metros 63 centímetros. Las partes manifiestan que no tienen observación que hacer y la Corte da por terminada la inspección y ordena que la misma se incorpore a los autos del caso como parte de la evidencia.''

A nuestro juicio de la prueba surge tan claro que el accidente se debió a la negligencia de la demandada que el error cometido por la corte sentenciadora al resolver lo contrario es manifiesto.

Negligente fué la demandada al correr a la velocidad que corría y al penetrar a esa velocidad en una curva por el medio del camino. De no ir a esa velocidad y de haber tomado su derecha no hubiera tenido que hacer el movimiento violento que hizo para no chocar con el otro *truck,* movimiento que determinó la caída de Hance y su muerte como consecuencia de ello.

Hance no era uno de los peones encargados del *truck,* iba en él para atender a un negocio de la demandada en otra línea. De acuerdo con las circunstancias puestas de manifiesto por la prueba no cabe atribuir su caída a su propia negligencia.

Es cierto que en *Aguayo* v. *Municipio de San Juan,* 35 D.P.R. 425, 427, dijo esta corte: ''En este caso la prueba tendió a mostrar que el conductor ocupaba el centro del camino.'' Y agregó: ''Generalmente no constituye negligen-

cia accionable que un conductor ocupe cualquier parte del camino cuando no está pasando en cualquier dirección por su frente ningún vehículo o persona.'' Pero este caso es muy distinto al de Aguayo. Aquí no sólo iba el conductor por el centro de la carretera, si que yendo por el centro y a gran velocidad tomó una curva que le impedía conocer si el camino estaba o no libre (*Cruz et al.* v. *Frau,* 31 D.P.R. 92) como en efecto no lo estaba viéndose obligado para evitar un choque con otro camión que venía por su derecha a hacer la rápida y violenta maniobra que hizo y que ocasionó la caída de una persona que iba en el *truck* confiada a su pericia y diligencia. En el caso de Aguayo se trataba de una niña que ''corrió súbitamente hacia el frente del automóvil,'' no pudiendo el conductor ''evitar el accidente'' no obstante los ''zigzags y otras tentativas'' que hizo ''con tal fin.''

Creemos que la corte sentenciadora expuso bien la jurisprudencia en su opinión cuando dijo:

''. . . La regla general en acciones de negligencia, es que la ocurrencia de un accidente no crea ninguna presunción de negligencia, a menos que las circunstancias que rodean el suceso causante del daño sean de tal carácter que ofrezcan una base para inferir razonablemente que si se hubiera observado el debido cuidado, diligencia y celo por parte del obligado a ello, el accidente no hubiera ocurrido. Doctrina ésta que aparece citada en *Correa* v. *The Fajardo Sugar Co.,* 29 D.P.R. 341, 345. También es conocida la regla de que la negligencia debe probarse por lo menos razonablemente.''

Pero estimamos que aplicando la regla así expuesta a los hechos de este caso se ve uno obligado a inferir razonablemente que si el conductor hubiera observado el debido cuidado, diligencia y celo, el accidente no hubiera ocurrido.

*Siendo ello así se impone la revocación de la sentencia apelada y el pronunciamiento de otra declarando la demanda con lugar y condenando a la demandada a pagar al demandante una indemnización que atendidas todas las circumstan-*

*cias concurrentes parece justo fijar en $3,000, con más las costas del pleito.*

El Juez Asociado Señor Wolf disintió.[*]

El Juez Asociado Señor Córdova Dávila no intervino.